In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1388

RICHARD J. RENNELL, JR. and
R.E. FUND MANAGEMENT GROUP, LLC,

*Plaintiffs-Appellant*s,

*v.*

RANDALL K. ROWE, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 2193—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 17, 2010—DECIDED MARCH 25, 2011

Before POSNER, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Richard Rennell and Randall Rowe ran a company that managed manufactured-housing communities. In 2007 Rowe bought out Rennell's interest in the joint venture. At the time, Rowe told Rennell that he was terminating the joint venture and essentially gave Rennell an offer he couldn't refuse: either

take approximately $300,000 and walk away, or walk away with nothing. Rennell took the money, but he was not pleased. He and his company, R.E. Fund responded with this lawsuit against Rowe, Rowe's existing company, Green Courte, and Green Courte's managers, Stephen Wheeler and James Goldman. (We refer only to "Rennell" and "Rowe" unless the context demands otherwise.) Rennell alleged that Rowe's heavy-handed purchase technique amounted to extortion, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b), 1962(c) and 1964(c). The district court dismissed, concluding that Rowe's conduct did not meet the definition of extortion under the Hobbs Act, 18 U.S.C. § 1951. We affirm.

**I**

Rennell and Rowe first combined forces in 2004. They created a joint venture that they called Green Courte R.E. Fund, and through it they owned and managed manufactured-housing communities in New York, Michigan, Pennsylvania, Wisconsin, and Minnesota. The joint-venture agreement provided that Rowe's company was to supply most of the necessary financing for each community, while Rennell's company would oversee operations and management. The duties and liabilities for the management of Green Courte R.E. Fund's properties were recorded in property-management agreements, which established that Rennell would be paid management fees for each community; the fees would be between 3 and 4% of the gross revenue produced by that commu-

nity. Rennell's operations were successful, generating profits and earning "excellent reviews" from Rowe.

A few years later, Wheeler joined Rowe's company, confusingly also called Green Courte (to be distinguished from the joint venture, Green Courte R.E. Fund), as Managing Director of Asset Management. Wheeler announced that, rather than continue the joint venture, he would bring all property-management responsibilities under the direct control of Green Courte. In November 2007, in order to bring Wheeler's plan to fruition, Rowe told Rennell that he was terminating their joint venture. Rowe proposed that Rennell sign a termination release, which included a promise not to sue Rowe in exchange for payment. But the amount that Rowe offered was quite low. While he had recently estimated on a June 2007 loan application that the value of Rennell's share of the joint venture was $3.5 million, Rowe was now offering Rennell only $282,980. Worse, Rowe gave Rennell only 24 hours to decide whether he would sign the release and warned that if Rennell refused to sign it he would get nothing. Rowe also threatened to make the termination public—a move that would have harmed Rennell's business prospects. Rennell agreed to the terms of the release, and his share in the joint venture reverted to Rowe.

But Rennell believed that he had been wronged. Soon after, despite the promise not to sue, Rennell filed this action, alleging that Rowe's conduct was extortion. His complaint described two different theories of liability under civil RICO, as well as nine state-law claims. Rowe

responded with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that his conduct was not extortion as a matter of law. The district court agreed and granted the motion. Declining to exercise supplemental jurisdiction, the court dismissed all of the state-law claims. Rennell appeals.

## II

### A

We review *de novo* the district court's conclusion that Rennell failed to state a claim upon which relief can be granted. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). To assess whether Rennell has presented enough to go forward, "we construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [his] favor." *Golden v. Helen Sigman & Associates, Ltd.*, 611 F.3d 356, 360 (7th Cir. 2010) (internal citations omitted).

Section 1962(b) of RICO makes it unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). Section 1962(c) adopts a slightly different focus, stating that "[i]t shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity . . . ." *Id.* § 1962(c). In both provisions, "racketeering activity" is defined to mean "any act or threat involving . . . extortion," among other state and federal crimes. *Id.* § 1961(1). In turn, the Hobbs Act defines the federal crime of extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." *Id.* § 1951(b)(2).

Rennell asserts that Rowe's behavior fits the statutory definition of extortion and thus establishes the predicate pattern of racketeering required by RICO. RICO permits a victim of racketeering activity to recover treble damages and reasonable attorney's fees in a civil action. *Id.* § 1964(c). The central question here is whether Rennell's complaint describes extortion, or something less than that. The district court took the latter approach, reasoning that the facts alleged by Rennell did not demonstrate that Rowe's buyout had been "wrongful" as the Hobbs Act uses the term. Accordingly, it thought, Rowe had not committed extortion and thus Rennell had failed to state a claim under RICO. (The court said nothing about the question whether the complaint described the kind of pattern of racketeering that RICO requires. We too put that issue to one side, since it is unnecessary to the outcome.)

B

Distinguishing between hard bargaining and extortion can be difficult. See, *e.g.*, STUART P. GREEN, LYING, CHEAT-

ING, AND STEALING: A MORAL THEORY OF WHITE-COLLAR CRIME ch. 17 (2006). But the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396 (1973), and our later decisions provide helpful guidance about what activities constitute the federal crime of extortion under the Hobbs Act.

Extortion is a federal crime, as we have noted, only when property is obtained by consent "induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2). The *Enmons* Court considered whether a union had committed extortion when its members engaged in violent acts during a strike undertaken to obtain raises from a utility company. *Enmons*, 410 U.S. at 397. The Court reasoned that it would be redundant to read the term "wrongful" in the Hobbs Act to describe "force, violence, or fear," which are always wrongful. *Id.* at 399-400. Instead, it concluded that the use of force, violence, or fear to obtain property is "wrongful" for purposes of the statute only when the alleged extortionist has no claim of right to that property. *Id.* at 400. Because the objective of the union's strike was to obtain compensation for which the striking workers had a lawful claim, the workers had not committed extortion under the Hobbs Act. *Id.* at 398, 410. While this may seem odd at first glance, the Court emphasized that the Hobbs Act was never intended to "reach violence during a strike to achieve legitimate collective-bargaining objectives." *Id.* at 404.

We have understood *Enmons* to be limited to the context of organized labor. In *United States v. Castor*, 937

F.2d 293 (7th Cir. 1991), we considered the defendant Castor's efforts to engage Smokey Mountain Chew, a maker of chewing tobacco substitutes, in a marketing agreement. Castor used the threat of force to bring Smokey Mountain Chew on board. *Id.* at 295. We held that the *Enmons* claim-of-right defense did not apply. "Whatever the contours of that defense may be," we said, "they do not reach extortions based on threats of physical violence outside the labor context. . . . [Y]ou cannot beat someone up to collect a debt, even if you believe he owes it to you." *Id.* at 299 (internal citations omitted).

Along similar lines, we have held that a defendant can be liable under the Hobbs Act for the wrongful exploitation of fear to obtain property, even if there is no explicit threat. See *United States v. Lisinski*, 728 F.2d 887, 891 (7th Cir. 1984). The defendant in *Lisinski* demanded money from a restaurant owner who was in danger of losing his liquor license, in exchange for the defendant's efforts to influence the Illinois Liquor Control Commission. Even though the defendant had not explicitly threatened the restaurant owner, we found that the wrongful use of fear and the lack of any claim of right to the victim's property could be extortion under the Hobbs Act. *Id.* at 892.

In sum, extortion under the Hobbs Act can occur outside of the labor context when a person uses physical violence or the threat of violence to obtain property, whether or not the defendant has a claim to the property. If a defendant has no claim of right to property, the use

of fear to obtain that property—including the fear of economic loss—may also amount to extortion. In contrast, where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred. See *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523-24 (3d Cir. 1998). We consider Rennell's assertions against this backdrop.

C

Rennell offers two principal reasons why his case states a claim under RICO. First, he says, Rowe had no claim of right to Rennell's interest in the joint venture (*i.e.*, the property that Rowe obtained). Second, Rennell asserts that Rowe's use of economic fear to obtain the interest was not legitimate. Because Rowe's putative extortive conduct concerns an effort to obtain property through fear of economic loss, and not physical violence, *Enmons* requires us to turn first to the question whether Rowe had a claim of right to Rennell's interest in the joint venture. The answer depends on the contractual arrangements between the two.

Rowe argues briefly that Rennell never had a compensable property interest in the joint venture. But he does not develop this point; instead, both parties focus on the question whether Rowe was authorized to terminate the joint venture without cause. If he was, Rennell concedes, then nothing happened that could be labeled "extortion." Two tiers of contracts are pertinent: the

agreement between Rennell and Rowe that set out both parties' rights in the joint venture; and the property-management agreements that governed the manufactured-housing communities the joint venture managed. The joint-venture agreement provided several grounds on which either Rennell or Rowe could terminate the entire enterprise "for cause." Critically for our purposes, the "termination of *any* property management agreement between [Rennell] and [Rowe]" provided the basis for Rowe to terminate the joint-venture agreement "for cause." (Emphasis added.) In contrast, each property-management agreement contained two grounds for termination without cause. The first permitted either party to terminate any property-management agreement with 30 days' notice. Under this provision, if Rowe terminated, he was required to pay all of the costs related to personnel hired by Rennell to manage the community in question. The second provided that if Rowe terminated with less than 30 days' notice, Rowe was required to pay Rennell both the personnel costs and a *pro rata* share of the management fees. The result was that Rowe could terminate any of the property-management agreements by paying Rennell fees and costs, and then terminate the overarching joint-venture agreement because a property-management agreement had been terminated.

Rennell argues that the property-management agreements could be terminated only for cause; and because there was no cause, their termination cannot provide the basis for the termination of the joint-venture agreement. He notes that the alleged without-cause provisions in the property-management agreements are

labeled as "Notice" provisions in the contract. These "Notice" provisions discuss only what is required if a party terminates without cause. There is no separate provision, he points out, affirmatively allowing a party to terminate without cause. Second, Rennell speculates that the "fleeting references" to termination without cause that appear in the agreement were "remnants" from some earlier version that the parties rejected. At most, he urges, they create an ambiguity that must be resolved by a trier of fact.

Both arguments fail to persuade. First, it would be odd to read these "Notice" provisions discussing the requirements for terminating without cause as a back-handed way of saying that termination without cause is impossible. Consider an analogy: Suppose a fruit-market owner says to a customer, "If you take a peach, you must pay me a dollar." The customer picks up the peach—dollar in hand—and the owner barks, "Hey, not so fast. I said that *if* you take a peach, you have to pay me a dollar. But I never said that you actually could take a peach!" The customer would rightly feel misled, since the common-sense meaning of the first sentence is simply to set the stage for a sale. But Rennell is asking for the same kind of twist: he wants us to read these provisions as explaining what Rowe must do *if* he were allowed to terminate without cause, but not as something indicating that Rowe generally has the right to terminate without cause. We are not prepared to accept such a strained interpretation. See *Chi. Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983) ("[W]e will [not] follow a literal interpreta-

tion when [to do so] would lead to an unreasonable or absurd result.").

We are equally unpersuaded by Rennell's effort to shape the contractual language to his liking. There is a notable difference in the property-management agreements between the terms allowing termination without cause and those addressing for-cause terminations. The former expressly require Rowe only to pay costs to Rennell if Rowe terminates without cause, while the latter impose the higher burden of demonstrating acceptable cause. There is therefore nothing superfluous about the for-cause provisions. Rennell effectively concedes that his argument requires us at worst to pretend that the without-cause provisions are not in the contract, and at best to find the contract ambiguous. We see no reason to take either of those paths, in light of the straightforward interpretation that is possible. See *Kim v. Carter's Inc.*, 598 F.3d 362, 364 (7th Cir. 2010) (stating that courts avoid interpreting agreements in a way that would nullify provisions or render them meaningless). All of this means that Rowe did have a right, under the property-management agreements, to terminate without cause, and once he did that, he also had a right to terminate the joint-venture agreement.

This brings us to Rennell's second argument: Rowe failed properly to terminate the property-management agreements because he did not pay what was due. This was more than a simple breach of contract, Rennell contends, because the amount Rowe offered was so deficient that it was extortionate. The choice between 8% of

what was owed and zero was no choice at all. As further proof that this was extortion, Rennell asserts that Rowe's "offer" was accompanied by the threat that Rowe would run him out of the business. Thus, Rennell concludes, even if Rowe had a claim of right, his use of economic fear was illegitimate and thus qualified as extortion.

As we have already explained, there is nothing wrong as a matter of theory with this point. One could imagine a case, along the lines of *Castor*, where the use of economic fear to obtain property would be so unreasonable that a claim-of-right defense would not insulate the actor from extortion liability under the Hobbs Act. But this is not that case. Even taking the pleadings favorably to Rennell, Rowe was engaged in nothing more than unpleasant hard dealing. Rennell alleges only that he was offered a very low price. He remained free to reject it and to sue for breach of contract. As for defamation, Rennell has alleged only that Rowe threatened to spread the word about the termination of the relationship and that this publicity would hamper or prevent Rennell from continuing in the business. But a truthful report about the end of a joint venture, even if detrimental to someone's business interests, is not defamatory, nor does it add anything to the extortion accusations.

We realize that Rennell believes that Rowe dealt badly with him. We take Rennell at his word that Rowe's actions amounted to economic duress. Rowe may also have breached his duties under the contracts and acted in violation of the general duty of good faith and fair

dealing, among other things. But those claims should be pursued through state-law theories of contract and, perhaps, tort—not civil RICO. We note as well that Rennell's state-law claims are still alive, because the district court dismissed them without prejudice when it relinquished its supplementary jurisdiction. The state courts are the right place to sort out this business dispute.

We therefore AFFIRM the judgment of the district court.