In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-3593

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KATHRYN G. GARTEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 12-CR-30320 — **G. Patrick Murphy**, *Judge.*

ARGUED SEPTEMBER 18, 2014 — DECIDED JANUARY 23, 2015

Before WOOD, *Chief Judge,* and POSNER and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Following a four-day trial, a jury convicted Kathryn Garten of conspiracy to commit mail and wire fraud in the conduct of telemarketing, in violation of 18 U.S.C. §§ 1349, 2326(1). The district court then sentenced Garten to 168 months in prison and a five-year term of supervised release, and ordered her to pay $909,278 in restitution. Garten appeals, challenging the sufficiency of the evi-

dence, the admission of testimony that a co-conspirator had pleaded guilty to the same offense, a comment made by the district court judge at trial, and the calculation of the loss for sentencing purposes. We affirm.

**I.**

In November 2012, a federal grand jury returned a one-count indictment charging Kathryn Garten with conspiracy to commit mail and wire fraud in connection with telemarketing, in violation of 18 U.S.C. §§ 1349 and 2326(1). Garten pleaded not guilty and proceeded to trial. Over the course of a four-day trial, the jury heard testimony from eight witnesses: four victims of the fraud; an investigator for the Federal Trade Commission; a fraud analyst for the United States Postal Inspection Service; an indicted co-conspirator who was testifying as part of a cooperation agreement; and Garten herself. While Garten maintained her innocence, because this case comes to us following a jury verdict,

> [t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted). Therefore, we summarize below the evidence elicited at trial "in the light most favorable to the government." *United States v. Squibb*, 534 F.3d 668, 669 (7th Cir. 2008).

In April 2008, Garten began working as a telemarketer for National Solutions in Orlando, Florida. While working for National Solutions, Garten called hundreds of individuals located throughout the United States who owned timeshares. A timeshare is a right to use a residential property for a set number of days each year. Timeshare properties are typically located in tourist locations and many timeshare agreements allow owners to swap their time at one resort for time at another locale. While some timeshare owners are happy with the arrangement, over time many wish to dispose of their timeshares because, as they age, interests change and travel becomes more difficult, and the annual maintenance fees escalate and become burdensome. But, according to a government witness, there is no real secondary market for timeshares.

National Solutions, as well as several related entities, was owned by Leandro Velazquez.[1] (We use "National Solutions" throughout as shorthand for all the related Velazquez entities.) Velazquez devised a scheme to use National Solutions to defraud the owners of timeshares who wished to sell their properties. Basically, the plot entailed Velazquez setting up National Solutions and the other entities to look like legitimate telemarketing firms that represented people who wanted to sell a timeshare. They obtained state licenses to operate, and applied for regulatory approval of scripts telemarketers were purportedly to use to solicit willing sellers

---

[1]    The related entities included Blue Scape Timeshares, Sun Property Networks, Resort Advisors, and City Resorts.

to pay National Solutions a fee in exchange for advertising the timeshares for sale.

However, rather than using the state-approved script, Velazquez told his employees to use another script, referred to as a "buyer pitch." (He also told the employees to use an alias instead of their real names.) In following the buyer pitch, National Solutions employees would falsely tell owners of timeshares that they had a purchaser for their timeshare, but that to finalize the sale, the timeshare owner needed to provide funds up front to arrange for the closing. The timeshare owners were also falsely told that they would get the money back at closing and that the funds would be held in a trust account. Once the timeshare owners agreed to sell their timeshare at the discussed price, National Solutions transmitted a contract to them. However, the fine print of the contract stated that the funds remitted (supposedly to arrange the closing) were for "a one-time nonrecurring and nonrefundable advertising fee."

After receiving the signed form contract, a National Solutions employee would tell the timeshare owner that they would receive another call for purposes of a Federal Trade Commission ("FTC") verification. The purported FTC verification had nothing to do with the FTC, but instead was part of the scam, the purpose of which was to obtain a recording of the timeshare owner responding to two questions: first, whether they had been given any information on a specific purchaser for their property; and second, whether they had received any other promises from National Solutions. If the timeshare owner did not respond "appropriately" to these questions (meaning, they verified in the recording that National Solutions had not provided them with a

purchaser's information or made any other promises), National Solutions would drop that "prospect."

In order to assuage any suspicion and to get the timeshare owners to state on the recorded calls that National Solutions had not promised anything or given a buyer's name, a National Solutions employee would prep the timeshare owner before the "FTC verification" call. The National Solutions employee would soft-sell the questions and tell the timeshare owner that the first question merely meant that National Solutions had not provided the owner with confidential information about the buyer, such as his social security number or date of birth. And that the second question merely meant that National Solutions had not promised them anything as a reward for selling the property, such as a car or a trip to the Bahamas.

Once National Solutions received the signed contract and the funds, and succeeded in obtaining a recorded confirmation of the contract, it would add the timeshare location with a brief description and a price on a list on the internet of properties for sale. It did nothing further, except to delay and dissemble. When the sale did not proceed as promised, the timeshare owners would start calling National Solutions. The employees would make up excuses about why the closing was not proceeding. One excuse they gave was that there was a problem with "get-away weeks," which were apparently extra weeks a timeshare owner had earned. The National Solutions employees would claim they needed further funds to arrange the transfer of the get-away weeks in order to proceed with the initial closings. And again, this was a lie. There were no buyers for the get-away weeks, just as there were no buyers for the timeshares. After receiving these ad-

ditional funds, National Solutions continued its delay tactics until the timeshare owners stopped calling. No sales were ever closed.

If the timeshare owners complained, National Solutions would point to the contract language which, as noted above, stated in fine print that the fee was for advertising. And it would have the recorded call from the purported FTC verification, in which the timeshare owner had confirmed that it had not been given information about a specific buyer and had been given no other promises. Sometimes, though, in order to quell some more vocal complaints, National Solutions would refund those fees.

All told, National Solutions obtained $6,047,796 from this fraud. Velazquez would keep a majority of the funds (70%) and the telemarketers, who had solicited and then sealed the deal with the various marks, would receive a cut: if they had handled the entire deal, they would receive 30%; but if one or more telemarketers were involved, they would split the 30% among themselves.

Eventually, enough people complained to governmental agencies that the FTC began investigating National Solutions. In July 2011, the FTC filed a civil complaint against National Solutions and obtained an *ex parte* temporary restraining order, an asset freeze, and the appointment of a receiver over the company. In conjunction with that case, on July 13, 2011, the FTC raided two National Solutions locations in Florida.

While one location was mostly empty, the other office building had between five and ten employees present when agents arrived. The agents photocopied the driver's licenses

of the employees who were present, which included defend-
ant Garten as well as her son. The investigators also seized
records and other evidence, drew a layout of the office, and
took pictures and a videotape of the office. Specifically, they
took a photograph of the cubicle where Garten worked, as
well as her telemarketing license which was affixed to the
cubicle wall. The documents seized also showed that Garten,
while working for National Solutions, used the aliases "Por-
ter Sullivan" and "Loreen Rinehart."

After the raid, the government indicted Garten and two
other telemarketers, Arantzazu Atorrasagasti (who used the
aliases Samantha Roberts, Cynthia Jones, and Alex Walker),
and Carmen Picache (who used the alias Kelly Jones). Before
he could be arrested, Velazquez disappeared, later telling
Atorrasagasti he wanted to go to the Dominican Republic.[2]

Garten pleaded not guilty and proceeded to trial. Both
Atorrasagasti and Picache pleaded guilty. Atorrasagasti tes-
tified at Garten's trial as part of her cooperation agreement.
Picache did not testify, although at oral argument the gov-
ernment indicated that she was available to testify and was
actually in the courthouse hall, but they decided they did not
need her testimony. While Picache did not testify at trial, the
government elicited testimony from Timothy Brunholtz,

---

[2] As of the date of Garten's trial, several other National Solutions
employees had not been indicted, including Kiomary Cruiz, Edgar Gon-
zalez, Jason Falkner, Lisa Correa, and Samwell Velazquez (Leandro Ve-
lazquez's brother). We do not know whether they have since been in-
dicted.

who was a fraud analyst working with the United States Postal Inspection Services, that Picache had pleaded guilty.

At trial, Atorrasagasti testified at length concerning the fraudulent scheme, as summarized above. She also testified concerning Garten's participation in the scheme. Atorrasagasti explained that she and Garten sat two cubicles away from each other and that she heard Garten use the buyer pitch on the telephone. She heard Garten tell customers that "there's a buyer ready," that "[t]hey had money in escrow," "[t]hey will take care of the title search, title transfer," and "[t]he escrow money will be in the trust account." Atorrasagasti explained that none of that was true and that the National Solutions businesses were "just one big scam." There were no buyers and there were no closings. She further testified that the fact that there were no buyers was something that was discussed in Garten's presence. Atorrasagasti told the jury that she knew what she was doing was wrong and illegal and that she had been indicted on the same charges as Garten—conspiracy to commit mail and wire fraud—and that she thought it was fair that Garten had also been prosecuted "[b]ecause, for me and her, we did the same thing, and we are both prosecuted."

The jury also heard from Douglas McKenney, who was the investigator for the FTC involved in the case. He explained the FTC's involvement in the case and the results of the raid of National Solutions' offices. Timothy Brunholtz also testified for the government. He explained his role in investigating the timeshare resale fraud, as well as his involvement in the FTC raid of National Solutions' offices. During the raid, Brunholtz interviewed Garten. Brunholtz told the jury that he explained to Garten that the FTC had

received complaints from timeshare owners about the company "cold-calling" them, promising buyers for their timeshare, and that "there was a good possibility" there had been violations of the federal mail and wire fraud statutes. Brunholtz told the jury that "[a]lmost immediately," Garten said that as far as she knew, the company was only involved in advertising. Garten also told Brunholtz that she was a "fronter"—someone who would simply call the customers and ask them if they were interested in selling their timeshares. Brunholtz also explained to the jury that he "looked through practically every document in that business," but did not find any advertising documents, closing documents, title searches, or communications between resort facilities and various buyers, which he would have found if the business legitimately had buyers.

Brunholtz also testified about a spreadsheet he created based on information extracted from Garten's weekly sales logs recovered during the raid. In explaining the spreadsheet, Brunholtz described two figures in bold on the last page of the exhibit—$705,808.07 and $98,569.22—as the gross amount of sales and Garten's commissions for those sales, respectively. The prosecutor then asked Brunholtz to explain what that meant in "layman's terms." Brunholtz responded: "The number on the left is the gross sales. That is the total amount that had been charged the consumer, stolen from the consumer." Garten's attorney objected "to the characterization." The district court overruled the objection, stating: "I think we have sufficient evidence in terms of that's accurate. The jury has to make a finding whether they believe that, but the evidence is that none were ever sold."

While Garten had told Brunholtz that National Solutions was merely involved in advertisement and that she only called to see if timeshare owners were interested in advertising their timeshares, two of her victims testified that Garten had told them she had buyers for their timeshares. And they had recorded their telephone conversations with Garten.

One such victim, Duane Schmidtke, told the jury that on March 22, 2011, he received a call from a company called City Resorts (which was one of the National Solutions affiliates), from a sales representative named Porter Sullivan. (Porter Sullivan was an alias for Garten, which Garten admitted using.) Garten told Schmidtke that she had a buyer for his timeshare in Maui and could get him $39,000 for it. Schmidtke wanted his wife on the phone to talk with Garten because they had "been scammed before," and so the couple called Garten back the next day. Schmidtke recorded this second phone call, as well as 45 more calls he had with Garten and two other company representatives over the course of several months between March 23, 2011, and July 11, 2011.

All of the calls that Schmidtke recorded were admitted into evidence on a compact disc marked as Government's Exhibit 60. Unfortunately, the exhibits were not filed on appeal and the district court docket indicates that the exhibits were returned to the parties, pursuant to their stipulation. So we don't have the recordings to listen to, although we do have a partial transcript of the recordings, which was included with the PSR. We are thus left with only Schmidtke's (and other witnesses') more limited summary of what Garten said during those calls.

Schmidtke explained that during the March 23, 2011, call with his wife, Garten told him that she had a buyer for their timeshare, but they needed to pay $2,649 up front, which she said would be placed in a trust account "that nobody was going to touch," and that they would get their money back once everything settled. Schmidtke acknowledged he signed a contract with City Resorts which stated: "I understand and acknowledge the following: City Resorts is an advertising company. The property owner pays a one-time, nonrecurring advertising fee." Garten, however, told Schmidtke in the first recorded call that the fine print in the contract was "very confusing" and that it had to be on every contract, but that it didn't pertain to him.

After paying the initial $2,649, the closing did not proceed as scheduled, at which point Atorrasagasti spoke with the Schmidtkes and told them the delay was caused by the need to transfer "get-away weeks," and that they would need to pay additional up-front costs to process the transfer of the "get-away weeks," at which point the timeshare closing could proceed. The Schmidtkes again forwarded money to National Solutions, which along with the initial funds paid made the total paid to National Solutions nearly $4,200. National Solutions never sold the Schmidtkes' timeshare.

Scott MacLean also testified for the government. He explained that he received a call from a sales representative named Dominic Ferrara, who told him that he had buyers interested in purchasing two timeshares owned by Mac-Lean's parents. (Scott handled his parents' timeshares through a power of attorney.) When Ferrara floated a price, MacLean said that the price seemed low, to which Ferrara responded he would "check with the buyer" about a higher

price. Ferrara later told MacLean that the buyer had come up on the price, agreeing to pay $42,840 for one timeshare and $12,600 for the other. After MacLean received the National Solutions contract, he expressed concern "because it looked like a listing arrangement for advertisement," but then a woman named Porter Sullivan explained to him that the $4,995 he would pay up front was "basically earnest money" that would be deposited into a trust account and refunded to his father at closing.

Like Schmidtke, MacLean had recorded the conversations he had with the National Solutions representatives and the government admitted into evidence as Exhibit 54 a compact disk with sixteen recorded calls on it. Twelve of the calls were played for the jury. In the second recorded call, Garten assured MacLean that the contract he had signed and faxed back to her was a sales agreement, not a listing agreement. MacLean eventually mailed a cashier's check for $4,995 to National Solutions.

After MacLean mailed the $4,995 to National Solutions, the closing did not proceed as scheduled. Garten explained that the hold-up was the transfer of "get-away weeks," and that to transfer those to the buyer and then close on the initial timeshare sale, MacLean needed to remit another $2,500. He did, but the sale never happened and his parents were out nearly $7,500.

Two other victims, Beverly Jones and Marvin Boswell, also testified. While neither Jones nor Boswell had spoken to Garten, they testified that other National Solutions employees followed a similar "buyer pitch." They explained how they were called by National Solutions representatives, told National Solutions had buyers for their timeshares and that

to close they needed to provide up-front payments, which they would then recoup at the closing. No closings, though, ever took place.

Finally, Garten testified in her own defense. Faced with the testimony and taped recordings of her conversations, which established that Garten had told the timeshare owners that there were buyers for the timeshares, Garten claimed that she was told there were buyers and believed there were buyers for the timeshares. The gist of her testimony was that she thought National Solutions was a legitimate business and that while she had lied, she believed that there truly were buyers for the timeshares.

The jury did not buy Garten's story and convicted her. The district court then sentenced her to 168 months in prison, five years of supervised release, and ordered her to pay $909,278 in restitution. In sentencing Garten, the district court found the loss involved in her offense of conviction was nearly $6 million. Accordingly, the district court increased her offense level by 18, pursuant to U.S.S.G. § 2.1(b)(1)(J), which applies for losses between $2.5 million and $7 million. Garten appeals.

## II.

On appeal, Garten presents four arguments. First, she argues that the evidence is insufficient to support her conviction for conspiracy to commit mail and wire fraud in connection with the conduct of telemarketing. Next, she argues that the district court committed reversible error by stating "that's accurate" in overruling Garten's objection to Brunholtz's testimony that the "gross amount" on Exhibit 79 was the amount "stolen from the consumer." Her third challenge

is to Brunholtz's testimony that co-conspirator Picache had pleaded guilty, arguing this constituted reversible error because Picache had not testified at Garten's trial. Finally, Garten challenges her sentence, arguing the evidence was insufficient to support the district court's finding that the loss involved totaled nearly $6 million. We consider each issue in turn, but having painted in some detail the scene before the jury, they are all easily—and quickly—disposed of.

## III.

### A.  Sufficiency of the Evidence

As noted, Garten first challenges the sufficiency of the evidence. "[T]o support [her] conspiracy conviction, the Government was required to prove that [s]he knew of the essential nature and scope of the charged conspiracy and that [s]he intended to participate in it." *United States v. Anderson*, 580 F.3d 639, 646 (7th Cir. 2009). Garten claims the evidence was insufficient to show that she knew of the nature of the conspiracy or intended to participate in it.

In reviewing the sufficiency of the evidence, we review the evidence in the light most favorable to the government, and we will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Molton*, 743 F.3d 479, 483 (7th Cir. 2014). However, the government argues that because Garten did not renew her motion for a directed verdict at the close of the evidence or file a motion for judgment of acquittal, she must demonstrate that her conviction was "a manifest miscarriage of justice." *United States v. Brandt*, 546 F.3d 912, 918 (7th Cir. 2008).

Garten cannot overcome this high standard. Nor can she overcome the less exacting but still weighty standard normally governing challenges to the sufficiency of the evidence. The government presented substantial evidence enabling the jury to conclude that Garten knew of the scope of the conspiracy and intended to participate in it. The testimony and recordings established that Garten told the timeshare owners that there were buyers for their timeshares and that the fine print referring to advertisements did not apply to them. Atorrasagasti testified that the fact that there were no buyers was something discussed in Garten's presence. And the jury heard from Brunholtz that when he interviewed Garten, "she said that as far as she knew, the company was only involved in advertising." Garten also told Brunholtz that she simply called the customers to ask if they were interested in selling their timeshares. Garten's trial testimony, that she only told timeshare owners there was a buyer for their timeshare because she was told there were, conflicted with her earlier statement. A reasonable jury could conclude that Garten had lied first to Brunholtz when she said the business was only involved in advertising, and then again to the jury when she said that she was told there were buyers for the timeshares. The jury could further reasonably conclude that Garten lied because she knew of the scope of the conspiracy and intended to participate in it. Accordingly, we reject Garten's challenge to the sufficiency of the evidence.

**B. The District Court's Statement That Brunholtz's Testimony was Accurate**

Garten next argues that the district court committed reversible error by telling the jury that Brunholtz's testimony that $705,808.07 was the amount "stolen from the consumer"

was "accurate." This argument is easily disposed of. Garten's argument takes what the district court said completely out of context. As explained above, after Brunholtz said that the sum $705,808.07 on Exhibit 79 was "the gross amount of sales," the prosecutor asked him to explain what that meant in "layman's terms." Brunholtz responded: "The number on the left is the gross sales. That is the total amount that had been charged the consumer, stolen from the consumer." In response to Garten's attorney's objection "to the characterization," the district court overruled the objection, stating, *in full*: "I think we have sufficient evidence in terms of that's accurate. The jury has to make a finding whether they believe that, but the evidence is that none were ever sold." In context, it is clear that the district court was not saying that the money, in fact, had been stolen; rather, the district court was addressing Brunholtz's characterization and stating that the amount was accurate as alleged and that the evidence was sufficient to support his characterization that the money had been stolen, but that it was up to the jury to decide whether or not to believe the testimony. The district court made no error in responding to the objection, and thus we reject Garten's challenge.

### C. Brunholtz's Testimony That Picache had Pleaded Guilty

Next Garten argues that Brunholtz's testimony that Picache had pleaded guilty denied her a fair trial because Picache did not testify at Garten's trial and thus was not subjected to cross-examination. Garten did not object to this testimony at trial, so our review is for plain error. *United States v. Vasquez*, 673 F.3d 680, 684 (7th Cir. 2012). The government rightly concedes that it was erroneous to elicit testimony that

Picache had pleaded guilty to the same offense as Garten without putting her on the stand. However, the government maintains that any error was harmless and thus not plain error.

We agree. As summarized above, the evidence against Garten was overwhelming. Conversely, the testimony that Picache had pleaded guilty was fleeting and was not stressed by the government or even mentioned during open or closing argument. Additionally, the jury had heard from Atorrasagasti, who had also pleaded guilty, and the district court instructed the jury that Atorrasagasti "has pled guilty to the same crime the defendant, Kathryn Garten, is charged with committing. You may not consider Ms. Atorrasagasti's guilty plea as evidence against Ms. Garten … you must consider that testimony with caution and great care." While Garten stresses that the jury did not receive a similar instruction concerning Picache's guilty plea, a reasonable jury hearing this instruction would infer that it likewise could not use the fact of Picache's guilty plea against Garten. Coupled with the overwhelming evidence against Garten, and the fact that mention of Picache's guilty plea was fleeting, it did not constitute plain error, "that is, the conviction of an innocent person … ." *United States v. Newman*, 965 F.2d 206, 213 (7th Cir. 1992).

### D. Amount of the Loss

Finally, Garten challenges the district court's determination of the loss for sentencing purposes. The district court found Garten responsible for approximately $6 million in losses, which represented the total amount of money deposited into National Solutions' bank accounts during the time period that Garten was actively participating in the conspir-

acy.  The district court then enhanced her offense level by 18, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), which applies for losses between $2.5 million and $7 million. We review the district court's calculation of loss for clear error. *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013).

While Garten argues that the $6 million loss was speculative, the evidence was more than sufficient to support the district court's finding. Specifically, Brunholtz testified he had reviewed the bank accounts of National Solutions and the net amount (amounts deposited less refunds issued) totaled approximately $6 million. Garten counters that National Solutions was involved in some legitimate rental activities and thus the $6 million in deposits was not all a result of fraudulent activities. But the district court heard testimony from Garten's co-conspirator Atorrasagasti that National Solutions was "just one big scam."   Additionally, Brunholtz had testified at trial that he "looked through practically every document in that business," but did not find any advertising documents or communications between resort facilities. Garten also did not present any evidence of legitimate activities, much less identify a dollar amount of non-fraudulent business activities. Under these circumstances, the district court did not commit clear error in enhancing Garten's sentencing level by 18 for causing a loss of between $ 2.5 and $7 million.

## IV.

A jury convicted Garten of conspiracy to commit mail and wire fraud in connection with the conduct of telemarketing after hearing overwhelming evidence against her. There was more than sufficient evidence to support this conviction. Thus, while it was error for Brunholtz to testify that Picache

had pleaded guilty to the same charge since she did not testify at Garten's trial, any error was harmless. There was no error, though, in the district court's response to Garten's objection to the characterization of the "gross amount" as the amount "stolen." The district court's comment, in total, made clear that he was not telling the jury that the money had been stolen—that was a question for the jury—just that the evidence could support that characterization. Finally, the district court did not clearly err in finding that the loss involved between $2.5 and $7 million for purposes of sentencing. The government presented evidence that the net deposits into National Solutions' bank accounts totaled approximately $6 million and that the entire business was a scam. Therefore, the district court could easily find the entirety of the net deposits was a loss related to Garten's offense of conviction. We AFFIRM.