In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 15-1862, 15-2096

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANK ORLANDO and ROBERT MCMANUS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cr-592 — **Edmond E. Chang**, *Judge.*

ARGUED FEBRUARY 26, 2016 — DECIDED APRIL 21, 2016

Before POSNER, FLAUM, and EASTERBROOK, *Circuit Judges.*

FLAUM, *Circuit Judge*. Defendants were convicted for their participation in a conspiracy to commit extortion. Robert McManus appeals his conviction on sufficiency of the evidence and procedural grounds. Frank Orlando appeals his sentence because of the district court's treatment of the minor role adjustment and for reasonableness. We are not persuaded by any of defendants' arguments and therefore, we affirm.

## I. Background

This consolidated case involves a scheme to extort money owed to American Litho, an Illinois printing company. In 2010, three companies—Union Transport Worldwide in Las Vegas, Nevada; Alcan Graphics in Neenath, Wisconsin; and Concrete Media in Hackensack, New Jersey—each owed American Litho large amounts in business debts.

American Litho is owned in part by Mark Dziuban, a defendant not involved in this appeal. Initially, Dziuban attempted to obtain repayment from the three indebted companies through legal means, including litigation, but was unsuccessful. In the spring of 2010, Dziuban contacted defendant-appellant Frank Orlando, an ink salesman at American Litho, to help collect these debts.

Orlando recruited Paul Carparelli and George Brown to collect the money. The four men met and arranged for Carparelli and Brown to fly to Las Vegas to collect approximately $113,772 from the owner of Union Transport Worldwide, Joe Visciano. Carparelli and Brown implied at the meeting that they would use physical violence and threats to collect the debt. Dziuban promised to give Carparelli and Brown half of any money they collected.

Carparelli and Brown flew to Las Vegas on June 1, 2010 with expenses paid by Dziuban. Orlando gave Carparelli an envelope of spending money also provided by Dziuban. In Las Vegas, Carparelli and Brown searched for Visciano but were unable to locate him. They returned to Chicago and reported back to Dziuban and Orlando.

Shortly thereafter, Dziuban, Orlando, and Brown met again, this time joined by Brown's friend Vito Iozzo. Brown

and Iozzo agreed to go to Wisconsin to collect the debt owed by Alcan Graphic's owner, David Jacek. Dziuban flew with Brown and Iozzo to Wisconsin on his private jet. Dziuban arranged to meet Jacek at a restaurant in Appleton, Wisconsin; he told Jacek that he would come alone.

On October 7, 2010, Dziuban went to the restaurant and met with Jacek. He asked Jacek whether he could pay back the debt. Jacek replied that his only asset was an antique car worth $39,000. Brown and Iozzo entered the room and closed the door. Brown pulled a chair close—elbow-to-elbow—to Jacek. Brown reiterated that Jacek owed Dziuban money and stated that the debt was "not going to go away." Jacek again offered his only asset, his antique car. Brown responded that this would satisfy part of the debt but that Jacek needed to get the rest of the money. Brown announced, "[w]e will be back." Before leaving, Iozzo demanded Jacek's driver's license, wrote down Jacek's address, and warned that he now knew where Jacek lived. Jacek testified that he feared for his well-being and the well-being of his family. Jacek reported the incident to the police.

After the men returned to Chicago, Dziuban, Carparelli, and Brown met again. Dziuban explained that Concrete Media, a company in New Jersey, owed him approximately $146,167. Dziuban also explained that he had found a new address for Visciano, the target of the Las Vegas extortion attempt, in Long Island, New York. Dziuban asked Carparelli, Brown, and Iozzo to travel to New Jersey and New York to collect from Concrete Media and Visciano. Carparelli was ultimately unable to go on this trip, so one of his friends, defendant-appellant Robert McManus, took his place.

On October 18, 2010, Brown, Iozzo, and McManus flew to New York with travel expenses paid for by Dziuban and an envelope of spending money delivered by Orlando. At their hotel in New Jersey, McManus researched Concrete Media and its owners on the internet and printed his findings. Using this information, Brown, Iozzo, and McManus located Concrete Media's offices and monitored the parking lot from a few blocks away to avoid detection. McManus wore a disguise to conceal his identity.

Unannounced, the three men entered the Concrete Media building and found their way into the office of Adam Goldenberg, Concrete Media's Vice President of Sales. Brown, a bareknuckle boxer with a heavy build, stood over Goldenberg while McManus and Iozzo stood by the doorway. Brown announced that they were there to collect the American Litho debt. Goldenberg replied that he could not talk about the debt because of a pending lawsuit. Brown declared that they were there to collect the debt and would not leave until they did. Brown grabbed Goldenberg's business card and stated that they would be back. Brown and Goldenberg shook hands and the men left. Afterward, Goldenberg called Concrete Media's owner and then the police. He testified that during the incident, he was threatened and scared.

At some point during the trip, Brown, Iozzo, and McManus also tried to locate Visciano but were again unsuccessful. The men returned to Chicago and reported to Dziuban and Orlando that they had successfully secured Concrete Media's attention.

In 2011, Brown began cooperating with the FBI. In 2013, acting under the government's instructions, Brown told Carparelli that he had received a call from a New Jersey state

police officer. This prompted a series of recorded conversations between Orlando, Carparelli, and Brown, in which they discussed the scheme and attempted to cover it up.

On July 23, 2013, a grand jury indicted Dziuban, Orlando, Brown, Iozzo, Carparelli, and McManus with violations of the Hobbs Act, 18 U.S.C. § 1951. Relevant to this appeal, Orlando and McManus were charged with conspiracy to commit extortion in violation of § 1951(a). McManus was also charged with attempted extortion under § 1951(a).

Orlando and McManus were tried together starting on September 29, 2014. After an eight-day trial, the jury convicted both defendants. The district court sentenced McManus to two concurrent sentences of sixty months imprisonment. McManus filed a number of post-trial motions, all of which were denied. The district court sentenced Orlando to forty-six months imprisonment. McManus appeals his conviction but not his sentence, and Orlando appeals his sentence but not his conviction.

## II. Discussion

### A. Robert McManus's Appeal

On appeal, McManus argues that there was insufficient evidence to support his conviction for conspiracy and attempted extortion. McManus claims that he only participated in the New Jersey collection attempt and that he lacked knowledge of the broader conspiracy that he was actually charged with. He also argues that the New Jersey collection attempt did not rise to the level of attempted extortion.

We treat a claim of a fatal variance between the conspiracy charged in the indictment and the evidence at trial as a challenge to the sufficiency of the evidence. *United States v. Dean*,

574 F.3d 836, 842 (7th Cir. 2009). "In reviewing the sufficiency of the evidence, we review the evidence in the light most favorable to the government, and we will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Garten*, 777 F.3d 392, 400 (7th Cir. 2015). A defendant faces an uphill battle in challenging the sufficiency of the evidence. *See United States v. Khattab*, 536 F.3d 765, 768–69 (7th Cir. 2008).

*1. Conspiracy Conviction*

The crux of McManus's appeal is that he played a limited role in the scheme and thus lacked the requisite knowledge to be convicted of the overarching conspiracy. He insists that his participation was confined to the New Jersey trip and that he did not know about the extortion attempts in Nevada and Wisconsin.

In the same vein, McManus contends that the overarching conspiracy was a "hub-and-spoke" conspiracy in which he had no connection, or "rim," to the other "spokes." That is, McManus argues that he did not join in the overarching conspiracy and only joined in the conspiracy to extort Concrete Media.

To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that the defendant "knowingly and intentionally joined in an agreement with one or more other individuals to commit an unlawful act." *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009). Accordingly, the government must show that McManus knew the essential nature and scope of the charged conspiracy and that he intended to participate in it. *Garten*, 777 F.3d at 400; *see also*

*United States v. Bruun*, 809 F.2d 397, 410 (7th Cir. 1987) ("While it is not necessary for the government to prove that an alleged conspirator was aware of every aspect of the conspiracy, it must show that he was aware of the essential nature and scope of the enterprise and intended to participate in it."). A defendant need not join a conspiracy at its inception or participate in all of the unlawful acts in furtherance of the conspiracy to be convicted. *See United States v. Spudic*, 795 F.2d 1334, 1337 (7th Cir. 1986).

By analogy, to prove a single conspiracy in the hub-and-spoke context, the government must show that "a rim … connect[s] the spokes together, for otherwise the conspiracy is not one but many." *Avila*, 557 F.3d at 814 (citation and internal quotation marks omitted). The "rim" is an agreement to further a single design or purpose. *Id.* By contrast, two individuals do not conspire together when they have two separate agreements, each agreement with its own end, and each constituting an end in itself. *See id.*

In the case at hand, there was sufficient evidence from which a reasonable jury could find that McManus knew the essential nature and scope of the overarching conspiracy. It is highly improbable that McManus accompanied Brown and Iozzo on a multi-day trip from Chicago to New York and New Jersey, investigated Concrete Media and its owners, went to Concrete Media's offices in a disguise, and confronted Goldenberg, all without knowing why. For this reason, McManus's suggestion that he believed that the New Jersey trip was a sightseeing vacation strains credulity. Further, the New Jersey trip shared overlapping participants, the same method, and a common goal with the two prior trips. These unmistakable similarities and the short timespan between the trips lend

support to the inference that McManus knowingly participated in the overarching conspiracy.

But perhaps the most powerful evidence that McManus knew about the overarching conspiracy is that he, along with Brown and Iozzo, attempted to locate Visciano in New York. This fact shows that McManus knew that the conspiracy extended beyond a single, isolated extortion. Hence, viewing the evidence in favor of the government, there was sufficient evidence from which the jury could conclude that McManus was aware of the essential nature and scope of the charged conspiracy.

In addition, there was substantial evidence that McManus agreed to join the overarching conspiracy, rather than just a smaller conspiracy. Even though McManus did not participate in the previous extortion attempts, those attempts involved the same individuals, a common method, and an identical goal. These similarities, in particular the same goal, supply the "rim" connecting the New Jersey trip to the previous two trips. McManus not only had knowledge of the nature of the overarching conspiracy, he agreed to and endeavored to further the purpose of that conspiracy.

McManus also makes two procedural arguments that largely rise or fall with his sufficiency of the evidence claim. McManus argues that because he was not a part of the overarching conspiracy, the district court erred by admitting the statements of his alleged co-conspirators at trial. He also argues that the district court should have severed his trial from Orlando's because of the risk of prejudicial spillover.

Because there was substantial evidence to support
McManus's conspiracy conviction, his two procedural argu-
ments also fail. Under Federal Rule of Evidence 801(d)(2)(E),
statements by a defendant's co-conspirator in furtherance of
the conspiracy are admissible non-hearsay. And for the rea-
sons discussed above, the government has made an adequate
showing that a conspiracy existed between McManus and his
alleged co-conspirators. *See United States v. Pust*, 798 F.3d 597,
602 (7th Cir. 2015) ("For a co-conspirator's statements to be
admissible under FRE 801(d)(2)(E), the government must es-
tablish by a preponderance of the evidence (1) that a conspir-
acy existed, (2) that the defendant and the declarant were
members of the conspiracy, and (3) that the statements were
made in furtherance of the conspiracy.").

Similarly, because they were co-conspirators, McManus
did not suffer undue prejudice by being tried with Orlando.[1]
*See* Fed. R. Crim. Pro. 14(a) (permitting a court to order sepa-
rate trials if joinder prejudices a defendant). Much of the evi-
dence at trial was admissible against both McManus and Or-
lando. *See United States v. Lanas*, 324 F.3d 894, 900 (7th Cir.
2003) ("[D]efendants' claim of prejudice is further undercut
by the fact that much of the evidence admitted at their joint
trial would have been admissible against them in separate tri-
als as well."). And the district court gave the jury appropriate
limiting instructions for the evidence that was only admissi-
ble against Orlando, as well as blanket limiting instructions
indicating that the jury should consider each defendant sepa-
rately. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993)
("[L]imiting instructions[] often will suffice to cure any risk of

---

[1] Accordingly, we need not address the government's argument that
McManus waived his motion to sever.

prejudice."). Thus, McManus cannot demonstrate that he suffered undue prejudice as a result of the joint trial.

In sum, there was sufficient evidence to support McManus's conviction for conspiracy, and the district court did not err by admitting the statements of co-conspirators or trying McManus alongside Orlando.

### 2. *Attempted Extortion Conviction*

Next, McManus challenges the sufficiency of the evidence supporting his conviction for attempted extortion. McManus attempts to characterize the encounter with Goldenberg at Concrete Media as merely "unpleasant hard dealing" rather than criminal extortion. He emphasizes that the encounter lasted roughly five minutes, Brown did not act violently or make any explicit threats, and the episode ended in a handshake.

Under the Hobbs Act, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). In *Rennell v. Rowe*, we addressed the distinction between extortion and hard bargaining. 635 F.3d 1008, 1011 (7th Cir. 2011). We explained that extortion occurs "when a person uses physical violence or the threat of violence to obtain property, whether or not the defendant has a claim to the property." *Id.* at 1012. By contrast, "where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred." *Id*. In *Rennell*, we held that the defendant "engaged in nothing more than unpleasant hard dealing" by offering the plaintiff a very low price for his interest in a joint venture

and thus did not commit extortion. *Id.* at 1014. But we noted that "a defendant can be liable under the Hobbs Act for the wrongful exploitation of fear to obtain property, even if there is no explicit threat." *Id.* at 1011–12 (citing *United States v. Lisinski*, 728 F.2d 887, 891 (7th Cir. 1984)).

Applying our reasoning in *Rennell* to the case at hand, there was sufficient evidence for a jury to find that McManus's co-conspirator, Brown, exploited fear even without making an explicit threat in an attempt to obtain property. After the three men entered Goldenberg's small office uninvited, Brown—an imposing figure weighing more than 300 pounds—stood directly over Goldenberg at his desk. Meanwhile, McManus and Iozzo stood by, or blocked, according the government, the door. Brown announced that they were there to collect the debt. Brown testified that he told Goldenberg that "he needed to pick up the phone and call, call the guys at American Litho [because] if you fuck the guy, call him up and tell him you fucked him, and then we will proceed from there." After Goldenberg refused, Brown said "listen, nobody is unreasonable here…. you got a bill, this isn't going to go away…. pick up the phone and call the guy…. I will be back, we will be back." Goldenberg testified that he was frightened by this encounter and concerned for his personal safety. After the men left, he called the police.

A reasonable jury could interpret this conduct as exploiting fear to obtain financial gain even without an explicit threat. As the district court aptly described it, "[t]he circumstances readily supported the feeling of fear: George Brown is, simply put, a living, breathing version of a Sherman tank. He showed-up, unannounced, with other men … demanding

payment of the debt in no uncertain terms." Against this backdrop, Brown's statement that they "will be back" supports a reasonable inference that the men were threatening Goldenberg with physical violence if he did not pay up. Hence, there was sufficient evidence to support McManus's conviction for attempted extortion.

### B. Frank Orlando's Appeal

Orlando argues on appeal that his sentence was improper. At sentencing, the district court denied Orlando a two-level decrease under the minor role adjustment, U.S.S.G. § 3B1.2, and sentenced Orlando to forty-six months imprisonment. Orlando contends that he is entitled to the minor role adjustment and his sentence is unreasonably disproportionate to those of his co-conspirators.

We review a district court's interpretation of the sentencing guidelines de novo and its factual findings for clear error. *United States v. Seals*, 813 F.3d 1038, 1044 (7th Cir. 2016). Because the denial of the minor role adjustment relies on a finding of fact, we review this determination for clear error. *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008). "Clear error exists when, after reviewing the evidence, we are left with a definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted). We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Reyes-Hernandez*, 624 F.3d 405, 409 (7th Cir. 2010). "A below-guidelines sentence, like a within-guidelines one, is presumed reasonable against a defendant's challenge that it is too high." *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009).

Orlando argues that he is entitled to the minor role adjustment because he did not actively participate in the actual extortions and was not present during any of the three collection trips. The minor role adjustment applies to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. 3(A). In assessing the defendant's role, we look "at his role in the conspiracy as a whole, including the length of his involvement in it, his relationship with the other participants, his potential financial gain, and his knowledge of the conspiracy." *United States v. Diaz-Rios*, 706 F.3d 795, 799 (7th Cir. 2013). We compare the defendant's role to that of an average member of the conspiracy, not with that of the leaders. *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007).

In *United States v. Leiskunas*, we clarified that "playing a necessary role does not definitively prevent that same role from being minor." 656 F.3d 732, 739 (7th Cir. 2011). For example, we observed that "drug couriers [may] receive the benefit of the adjustment, even though their role is necessary to the drug distribution." *Id.* Orlando seizes on this point, arguing that although his role in arranging the initial meeting between Dziuban and Carparelli was necessary, it was nonetheless minor.

We disagree. Orlando's role in the conspiracy was substantial. Orlando arranged the initial meeting with Carparelli, Brown, Dziuban, and himself. This initial meeting was not only necessary, but pivotal: It launched the entire conspiracy. Orlando's role was not akin to that of some faceless drug courier. He had personal connections to organized crime figures, and he leveraged those connections to recruit men to partici-

pate in the actual extortions. *Cf.* U.S.S.G. § 3B1.1, cmt. 4 (considering "the recruitment of accomplices" for the purposes of applying the leadership aggravating role adjustment).

Moreover, Orlando did more than just organizing the initial meeting. He attended the initial meeting and at least one subsequent meeting, during which the men planned and discussed the extortions. Further, Orlando actively participated in the conspiracy by serving as a middleman between Dziuban and the others. He gave the men going on trips spending money provided by Dziuban. He also relayed information between Dziuban and Carparelli. Finally, Orlando remained active in the conspiracy from its inception until its conclusion. Indeed, he even participated in the 2013 cover-up attempt. Accordingly, the district court did not clearly err by denying Orlando the minor role adjustment.

Lastly, Orlando argues that his sentence is unreasonable because of the disparity between his sentence and the sentences of his co-conspirators. In particular, Orlando notes that Iozzo, who participated in the actual extortions and admitted to participating in an unrelated, violent extortion, was sentenced to thirty-eight months imprisonment (eight months fewer than Orlando). Similarly, Brown, who was heavily involved in the actual extortions in this case, as well as a number of other separate extortions and had a criminal history, was expected to be sentenced to fifty-seven months imprisonment (eleven months more than Orlando) at the time of this appeal. And Dziuban, the apparent leader of the conspiracy, subsequently received the same sentence as Orlando. Citing these

sentences as a baseline, Orlando argues that his sentence is unreasonably disproportionate given his role.[2]

Orlando's argument is without merit for a number of reasons. For one, Dziuban and Brown were not even sentenced until after Orlando, so the district court could not have considered their sentences. *See United States v. Sanchez*, 710 F.3d 724, 733 (7th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 146 (2013) ("It makes no sense for the court to alter what it has found to be a fair sentence in this case based upon the speculated punishment of another individual."). In addition, Iozzo and Brown cooperated with the government and pled guilty. Orlando did not. "[A] sentencing *difference* is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Accordingly, "a sentencing difference based on one culprit's assistance to the prosecution is legally appropriate." *Id.* Although Dziuban did not cooperate with the government, he received the exact same sentence as Orlando. And in any event, Orlando does not explain why any difference in the treatment between Dziuban and himself at sentencing was improper. *See United States v. Gonzalez*, 765 F.3d 732, 739 (7th Cir. 2014) ("Unwarranted disparities result when the court relies on things like alienage, race, and sex to differentiate sentence terms."). In sum, the district court did not abuse its discretion in sentencing Orlando.

---

[2] Orlando also argues that three other men—Navit Chawla, Patrick White, and Elio DeSantis—were convicted for extortion and received far less severe sentences. But Orlando does not develop this argument to show that there was a forbidden sentencing disparity rather than a legitimate sentencing difference.

### III. Conclusion

For the foregoing reasons, we AFFIRM McManus's conviction and AFFIRM Orlando's sentence.