In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 24-1682 & 24-1801

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHELDON MORALES and EDUARDO SANTANA,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00850 — **Mary M. Rowland**, *Judge.*

———————————

ARGUED MAY 29, 2025 — DECIDED AUGUST 1, 2025

———————————

Before EASTERBROOK, BRENNAN, and SCUDDER, *Circuit Judges.*

BRENNAN, *Circuit Judge*. A jury found Sheldon Morales and Eduardo Santana guilty of conspiring to possess and distribute controlled substances. The defendants raise a host of issues related to their criminal proceedings. We affirm across the board.

## I

## A

Soon after his release from prison for a federal drug trafficking offense, Sheldon Morales fell back into similar habits. The Drug Enforcement Administration, acting on information from the Evanston, Illinois, Police Department, began surveilling Morales. In early 2019, the DEA intercepted various phone calls as part of its surveillance efforts.

The first relevant calls were between Morales and two unidentified men, believed to be incarcerated at the time, who presumably used a smuggled phone. These two inmates served as brokers between drug suppliers and distributors. Morales requested they arrange a shipment for samples of heroin, cocaine, and methamphetamine to a home in Evanston. After receiving the initial samples, Morales spoke again to the brokers about the structure of future transactions, such as how shipment and payment would be handled. Morales also told the brokers he would split proceeds with "Guajo," later determined to be Eduardo Santana.

Law enforcement, aware of an expected shipment to the Evanston home, seized a drug delivery after a canine alerted to the scent of narcotics. The package contained 5.43 kilograms of methamphetamine and 827 grams of fentanyl, the latter of which was mixed with other substances.

Calls intercepted in later weeks detailed Santana's role in the venture. He routinely served as a translator for conversations between Morales and a Mexican supplier—Omar—bypassing the inmate brokers. Other conversations revealed Santana was more than a mere translator. Speaking only to Santana after a call with Omar, Morales said the suppliers

were going to "make us the office of Chicago," and that the two would "run[]" the city. And after purchasing a "brick" of cocaine, Morales told Santana that the two were "finna go to the moon, bro."

At one point, Morales received a package that was supposedly empty, yet he did not retrieve it out of fear the police were watching the drop-off location. Upon prompting from Morales and Omar, Santana went to the location to confirm the box contained no drugs. Santana took a video of himself kicking the box to document how light the delivery was. He sent the video to Morales and Omar to ensure the suppliers did not believe they were being shortchanged on payment. Santana assured Omar "[i]n God's name and in the name of [his] kids" that the box was empty.

On another occasion, Morales and Santana discussed a joint plan to defraud Omar. Santana suggested they make a video of somebody getting arrested with what looked like a shipment of drugs. The two thought that by staging this false seizure, they could keep the shipment without paying their suppliers. Santana also steered Morales away from retaliating against a woman named Suzie, whom Morales feared had "called the feds" on him.

In the months after these calls, law enforcement intercepted two more packages containing narcotics. One had the same return address as the previously seized shipment and contained nearly two kilograms of cocaine. The other, which had a different return address but was delivered to Morales's residence, had over 800 grams of fentanyl.

**B**

Morales and Santana were indicted in the Northern District of Illinois for conspiring to possess with intent to distribute methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Morales was also charged with attempting to possess with intent to distribute methamphetamine and fentanyl, in violation of 21 U.S.C. § 841(a)(1).

Twice before trial Morales requested and was permitted to obtain new counsel, causing delays of the trial date. When Morales moved for new counsel a third time, the district court told him: "This is it. This is your third counsel. If this doesn't work out, you will not have an opportunity to have another counsel. Do you understand that?" Morales replied: "Yes, ma'am, I do." The court ultimately granted his request and Lisa and Joseph Lopez substituted in as new counsel, delaying the trial by another six months.

After five months of representing Morales, the Lopezes filed a motion to withdraw as counsel. They asserted that Morales had become verbally abusive toward Lisa Lopez and had attempted to micromanage litigation strategy. In response, the district court held a hearing to address the motion. It permitted Lisa Lopez to withdraw but declined to appoint new counsel in Joseph Lopez's stead. Santana remained in custody, and appointing Morales another lawyer would have required the district court to again delay the date of the joint trial.

A motion, purportedly from Morales, was mailed to the district court before the hearing. It asserted that the Lopezes were overbilling Morales for work performed and requested that the court appoint new counsel for him. Although the

document was sent before the hearing, it was not docketed until afterward. At no point during the hearing did Morales mention he had sent this to the court. To add further intrigue, another pro se motion—ostensibly also from Morales—was mailed after the hearing. It asserted that the motion to dismiss the Lopezes was fraudulently filed. And it clarified Morales would "retain his current attorney(ies)."

The case went to trial. Morales requested the district court read the jury a buyer-seller instruction, arguing he did not have a conspiratorial relationship with Omar and the two inmate brokers. *See United States v. Page*, 123 F.4th 851, 859 (7th Cir. 2024) (en banc) (Proof "that two people are in a buyer-seller relationship is insufficient to prove a drug-distribution conspiracy." (quoting *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 925 (7th Cir. 2022))). The court declined to provide the instruction, as it concluded the evidence did not support a mere buyer-seller relationship.

A jury convicted Morales of all charged conduct and Santana of conspiring to possess with intent to distribute only methamphetamine. Morales moved for a new trial under Federal Rule of Criminal Procedure 33, arguing that the lack of a buyer-seller instruction deprived him of a fair trial. Santana moved for a judgment of acquittal under Rule 29, claiming that the government presented insufficient evidence to convict him of conspiracy. The district court denied both motions.

At sentencing, Santana requested a two-level minor role reduction, arguing that his part in the offense was limited to serving as Morales's translator and "kick[ing] a box on a porch." *See* U.S. SENT'G GUIDELINES MANUAL § 3B1.2(b). The district court refused the reduction. It concluded that Santana was not simply "a translator," but rather "an equal" in the

conspiracy. The court sentenced Morales to 235 months' and Santana to 200 months' imprisonment. Both defendants now appeal.

## II

Santana raises two arguments. He first asserts that the government presented insufficient evidence to show he conspired to possess a controlled substance with intent to distribute. Second, he claims that the district court erred in not granting his request for a minor role reduction at sentencing.

## A

We review Santana's sufficiency of the evidence challenge de novo, looking at "the evidence presented at trial 'in the light most favorable to the government.'" *United States v. Gustafson*, 130 F.4th 608, 613 (7th Cir. 2025) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)). We will "affirm the conviction if any rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Id.*

For conspiracy, the government must have introduced sufficient evidence to "prove that two or more people agreed to commit an unlawful act and that the defendant knowingly and intentionally joined in that agreement." *Page*, 123 F.4th at 859. The government need not show the defendant engaged in an overt act. *Id.* (citing *United States v. Shabani*, 513 U.S. 10, 15 (1994)). Due to the secretive nature of conspiracies, the prosecution's case frequently will be "based largely (and often, solely) on circumstantial evidence." *Id.* at 861.

Santana argues that the evidence showed he served only as Morales's translator, not as his co-conspirator. Yet multiple aspects of the relationship between Morales and Santana support the conspiracy conviction. Co-conspirators possess

"shared interests" in the illegal activity, which can be demonstrated in many ways. *United States v. Jones*, 56 F.4th 455, 488 (7th Cir. 2022).

First, Santana "advised [Morales] on the conduct of" the latter's business. *Page*, 123 F.4th at 863 (quoting *United States v. Johnson*, 592 F.3d 749, 755–56 (7th Cir. 2010)); *Hidalgo-Sanchez*, 29 F.4th at 928. Most notably, Santana offered Morales a roadmap for how to cheat their supplier, Omar, out of payment for drugs. He suggested that Morales "make a video" of "somebody getting arrested" with a box, giving Omar the false impression that the drugs had been intercepted. Santana thought this advice was "big time."

Second, Santana and Morales "contemplated expanding their business relationship" with one another. *Page*, 123 F.4th at 863. Morales stated that the suppliers were planning to make him and Santana "the office of Chicago," and that the two would "run[]" the city. Although this expansion did not come to fruition, it supports an inference that Santana had a stake in the illicit venture. If that were not enough, the jury also heard evidence that Santana directed Morales's brother to "tak[e] advantage" of Morales's drug supply to sell to customers, thereby expanding the distribution network.

Third, the two warned one another of "threats to each other's business" from law enforcement. *Id.*; *United States v. Wright*, 85 F.4th 851, 862 (7th Cir. 2023). Santana advised Morales to "get some phones" because Santana did not "feel safe talking on" the devices they were using at the time. At trial, the government's witness explained Santana offered this "good advice" to Morales "out of fear"—which proved prescient—that law enforcement was listening to their

conversations. And Santana guided Morales against acting rashly when Morales feared a woman had "called the feds" on him.

Santana also checked on a drug shipment after Morales expressed concern that officers were watching the drop-off location. Morales had instructed him to look into it because the two thought the box was empty. So, to avoid having to pay for an empty package, under Morales's direction, Santana took a video of himself kicking the box to capture its light weight to show Omar that the package was delivered without narcotics. Taken together, the evidence demonstrates Santana was much more than a mere translator. Instead, he took an active role in the conspiracy and repeatedly reaped the benefits of its perpetuation.

Santana's primary rejoinder—that no direct evidence showed he possessed or controlled the drugs—is not persuasive. His sole conviction was for conspiring to possess with intent to distribute narcotics, not for the underlying substantive charge. And to sustain a conspiracy conviction under 21 U.S.C. § 846, the government needed only prove "that he agreed to the activities," not that he "personally bought, sold, or possessed any narcotics." *United States v. Morales*, 655 F.3d 608, 635 (7th Cir. 2011). Accordingly, the cases on which Santana relies are inapposite, as they each deal with substantive-offense sufficiency challenges. *Contra United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019); *United States v. Jones*, 713 F.3d 336 (7th Cir. 2013); *United States v. Katz*, 582 F.3d 749 (7th Cir. 2009).

In any event, the jury heard evidence belying Santana's claim that he did not possess drugs. Morales said on a phone call with an unidentified male that Santana would receive "a

whole one"—slang for a kilogram of drugs—for the "thing that [Morales and Santana] did." Further, Santana said he hoped Morales obtained a fresh supply of cocaine because Santana wanted to "push [his] little pow-wee"—or "pow-der"—out.

In sum, Santana's arguments, including "that he was merely aware" of the illegal activity, "may have been valid arguments to put before a jury, [but] they are not enough to support a sufficiency of the evidence challenge on appeal." *Morales*, 655 F.3d at 635 (alteration in original) (quoting *United States v. Taylor*, 600 F.3d 863, 869 (7th Cir. 2010)). Because the evidence, viewed in the light most favorable to the government, showed he knowingly agreed with Morales to commit an unlawful act, and had a stake in the illicit venture, we have little hesitation affirming Santana's conspiracy conviction.

**B**

Santana also challenges the district court's refusal to grant him a minor role reduction at sentencing. We review factual findings supporting the court's decision for clear error. *United States v. Tam*, 82 F.4th 536, 540 (7th Cir. 2023). The focus here is on the defendant's role compared to that of the "average member of the conspiracy," not to those of the leaders. *Id.* (quoting *United States v. Orlando*, 819 F.3d 1016, 1025 (7th Cir. 2016)). When reviewing role-adjustment decisions, we "rarely reverse, as the sentencing court is in the best position to determine the role that a defendant had in the criminal activity." *Id.* (quoting *United States v. Campuzano-Benitez*, 910 F.3d 982, 989 (7th Cir. 2018)).

The commentary to the Guidelines provides a list of non-exhaustive factors for courts to weigh when considering a

mitigating role adjustment. *See* U.S.S.G. § 3B1.2 cmt. n.3(C). We have summarized the factors by instructing sentencing courts to consider a defendant's "knowledge of the conspiracy, participation in planning and decision-making, and potential financial gain." *United States v. Guzman-Ramirez*, 949 F.3d 1034, 1037 (7th Cir. 2020).

At the outset, we note that Santana's effort to contrast his behavior with defendants from other cases misses the mark. The sentencing court must compare his conduct only "to that of other members in the *same* conspiracy." *Id.* at 1038 (saying that the defendant's "comparing himself to defendants in other cases" was "futile").

The district court did not clearly err in concluding that Santana was Morales's "equal" in the venture. As discussed in detail above, Santana had full knowledge of the conspiracy. He planned its operations with Morales, routinely provided necessary translation services, and benefited financially from its proceeds. Even crediting his argument that Morales, the brokers, and Omar were "more culpable," that alone does not warrant a sentencing reduction. *United States v. Zhaofa Wang*, 707 F.3d 911, 917 (7th Cir. 2013); *see also United States v. Turnipseed*, 47 F.4th 608, 615 (7th Cir. 2022) (explaining that a defendant must prove he was "*substantially* less culpable than the average participant" (emphasis added) (quoting *Orlando*, 819 F.3d at 1025)).

In sum, we see no issues with Santana's conviction or his sentence.

## III

Morales argues his conviction cannot stand for two reasons.[1] First, he asserts the district court erred in failing to give the jury his requested buyer-seller instruction. Second, he claims the district court violated his Sixth Amendment right to counsel of choice when it failed to hold a hearing after he purportedly filed his substitution-of-counsel motion.

## A

We review de novo "a district court's denial of a defendant's requested jury instruction." *United States v. Griffin*, 76 F.4th 724, 740 (7th Cir. 2023). A defendant is entitled to an instruction only when it (1) "represents an accurate statement of the law;" (2) "reflects a theory that is supported by the evidence;" (3) "reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the [defendant] a fair trial." *Id.* (alteration in original) (quoting *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014)).

Morales proposed a buyer-seller jury instruction different from this circuit's pattern instruction.[2] *See William J. Bauer*

---

[1] Morales proceeded pro se before our court. We have reviewed his submissions and determined that the facts and legal arguments are adequately presented in the briefs and record, and that oral argument of his appeal would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

[2] Morales's full proposed instruction read:

> A conspiracy to distribute drugs or possess drugs with intent to distribute requires more than simply an agreement to exchange money for drugs which the seller knows will be resold.

*Pattern Criminal Jury Instructions of the Seventh Circuit* § 5.10(A)
(2023 ed.). In arguing that the district court erred in denying
this request, Morales posits that the evidence did not show a
conspiratorial relationship among himself, Omar, and the in-
mate brokers. Yet the government did not need to prove that
Morales conspired with them.

Instead, the government needed to show only that
Morales conspired with a single other person to secure a con-
viction. As discussed above, overwhelming evidence demon-
strated a conspiracy between him and Santana. *See United
States v. Cruse*, 805 F.3d 795, 816 (7th Cir. 2015) ("The 'buyer-
seller' argument is irrelevant [when] the conspirators are on
the same side of the sale." (quoting *United States v. Payton*, 328
F.3d 910, 912 (7th Cir. 2003))). And "irrelevant" instructions
"would only serve to confuse the jury and need not be given."
*Id.* at 814. So, even if Morales had only a buyer-seller relation-
ship with Omar and the brokers, as he contends, there was
more than enough evidence to show he conspired with

---

In order to establish that a defendant knowingly con-
spired to distribute drugs or possess drugs with intent to
distribute with a person from whom the defendant
bought drugs, the government must prove that, in addi-
tion to agreeing to buy drugs, the defendant further
agreed to participate with the seller in an arrangement in-
volving mutual dependence, cooperation or assistance in
distributing drugs. Such an agreement may be proved by
evidence showing sales on credit, in which the buyer is
permitted to pay for all or part of the drugs after the drugs
have been re-sold, coupled with other evidence showing
cooperation and an ongoing arrangement between the
defendant and the seller.

Santana to support his conviction. The lack of a buyer-seller instruction, then, does not undermine the integrity of this jury's verdict.

**B**

Morales next argues that the district court violated his Sixth Amendment right to counsel of choice. Although such a violation is a structural error, a defendant's right to counsel of choice is "not absolute." *United States v. Velazquez*, 772 F.3d 788, 797 (7th Cir. 2014) (quoting *United States v. Sellers*, 645 F.3d 830, 834 (7th Cir. 2011)). A district court "retains wide latitude to balance the right to choice of counsel against the needs of fairness to the litigants and against the demands of its calendar." *Id.*

We need not engage with the merits of Morales's argument, as it stumbles right out of the gate: The record reflects that either he did not request or he disclaimed his request for new counsel. The full timeline shows why. After Morales had fired two attorneys, he retained Lisa and Joseph Lopez. On May 4, 2022, the Lopezes filed a motion to withdraw, describing how their relationship with Morales had become strained. Then, on May 11, a document—purportedly signed by Morales—was mailed to the district court, requesting the court to appoint him new counsel. It was not filed with the court, though, until May 18.

The district court held a hearing on the Lopezes' withdrawal motion on May 16—two days before it became aware of Morales's purported motion. The court excused Lisa Lopez from the case, but it did not allow Joseph Lopez to withdraw because doing so would unreasonably delay the trial. During this hearing Morales did not mention the May 11 motion for

the court to appoint new counsel. Instead, he acquiesced to the court's decision to deny Joseph Lopez's withdrawal.

Finally, on May 19—the day Morales learned of the May 11 document—he mailed a "notice of improper and fraudulent filing" to the district court, telling it that he did not send the prior request for new counsel. He asserted the first filing came from an organization called "Country Wide Legal Assistance," which did not have his approval to send the new-counsel motion. Morales clarified in the May 19 filing that he would "retain his current attorney(ies)." And, tellingly, on appeal Morales does not contest the validity of his "notice of improper and fraudulent filing," which disclaimed his participation in the May 11 document purportedly seeking new counsel.

Given this timeline, we are satisfied that Morales did not request an attorney other than Joseph Lopez.[3] Even if he did so in the May 11 filing, he expressly disavowed any request in the May 19 document. Either way, Morales cannot now fault the district court for denying him counsel of his choice when he expressly stated he would retain his current counsel.

*          *          *

We see no errors in the defendants' trial or sentences. The district court's judgments are therefore AFFIRMED.

---

[3] Morales also notes that he complained about Joseph Lopez's performance at a hearing less than a week before trial. Yet the record shows that at this hearing, the district court spoke to Morales about his concerns. Dkt. 224 at 3–10.